1
2
3    **UNITED STATES DISTRICT COURT**
4    **NORTHERN DISTRICT OF CALIFORNIA**
5

6    **SELENA MELTON, BY AND THROUGH HER**      CASE NO.  20-cv-06613-YGR
     **GUARDIAN AD LITEM, BEVERLY CANNON**
7    **MOSIER,**                                **ORDER GRANTING IN PART AND DENYING**
                                                **IN PART MOTIONS TO DISMISS AND**
8                        Plaintiff,             **DENYING MOTION FOR SANCTIONS**

9              vs.                              Re: Dkt. Nos. 52, 53, 54, 64

10   **CALIFORNIA DEPARTMENT OF**
     **DEVELOPMENTAL SERVICES, ET AL.,**
11
                         Defendants.
12

13           Plaintiff Selena Melton, by and through her guardian ad litem Beverly Cannon Mosier,

14   brings this action against defendants California Department of Developmental Services ("DDS"),

15   Regional Center of the East Bay, Inc. ("RCEB"), and Arleen's Residential Care, Inc. ("Arleen's"),

16   alleging violations of federal and state laws prohibiting disability discrimination.  Defendants have

17   separately moved to dismiss the First Amended Complaint ("FAC") for lack of subject matter

18   jurisdiction and/or failure to state a claim.  (Dkt. Nos. 52, 53, 54.)  In addition, RCEB moves to

19   sanction plaintiff's counsel for pressing frivolous arguments about exhaustion.  (Dkt. No. 64.)

20   Having carefully reviewed the amended pleadings and the parties' briefing on the motions, the

21   Court **GRANTS IN PART AND DENIES IN PART** the motions to dismiss and **DENIES** the motion for

22   sanctions.

23   **I.    BACKGROUND**

24           The FAC alleges as follows:

25           Plaintiff Selena Melton is 52 years old, was born deaf, and became blind later in life.

26   (FAC ¶¶ 1, 5.)  She uses Tactile American Sign Language ("ASL") to communicate, which

27   involves using one's hands to feel the ASL hand gestures of the signer.  (*Id.* ¶¶ 1, 9, 10.)  Plaintiff

28   also has been diagnosed with a mild intellectual liability, mild cerebral palsy, epilepsy, and

*United States District Court*
*Northern District of California*

anxiety.  (*Id.* ¶¶ 1, 5.)  As a result of her developmental disabilities, plaintiff has been receiving services administered by state agency DDS pursuant to the California Developmental Disabilities Services Lanterman Act ("Lanterman Act"), California Welfare & Institutions Code (W.I.C.), Section 5400, *et seq.*  (*Id.* ¶ 6.)  The Legislature determined that "[s]ervices and supports should be available to enable persons with developmental disabilities to approximate the pattern of everyday living available to people without disabilities of the same age."  (*Id.* ¶ 12 (quoting W.I.C. § 4501).)

Under this comprehensive statutory scheme, DDS contracts with nonprofit corporations to establish and operate a statewide network of regional centers.  W.I.C. § 4620.  Regional centers, like RCEB, are responsible for determining eligibility, assessing needs, and coordinating the delivery of services for developmentally disabled persons, referenced in the statute as "consumers."  *Id.*  If a regional center determines that an individual has a developmental disability and is eligible for services, a planning team, compromised of the individual with the disability, the parents or guardian, one or more regional center representatives, and any other person or entity invited to participate, draws up an individual program plan ("IPP").  *Id.* § 4512(j).  The goals developed through the IPP process should maximize opportunities for the individual to be part of community life, enjoy increased control over his or her life, acquire positive roles in community life, and develop the skills to accomplish these objectives.  *Id.* 4646.5(2); *see also id.* § 4646.  Regional centers contract with local service providers, referenced in the statute as "vendors," for the direct delivery of services.  *Id.* § 4648.

Plaintiff has been an RCEB client "for close to fifty years" and, since 1994, has lived in a state-licensed group home owned and operated by Arleen's.  (FAC ¶¶ 19, 22.)  RCEB contracted with Arleen's to provide housing accommodations and social services for plaintiff.  (*Id.* ¶ 25.)  Before plaintiff moved to Arleen's, the administrator at her previous home recommended to plaintiff's RCEB caseworker that she be placed in a home where staff could communicate with her in ASL.  (*Id.* ¶ 26.)  Since then, "over the past several decades," plaintiff "requested many times" for some "means to communicate equally and effectively with the staff" at Arleen's.  (*Id.* ¶¶ 26–28.)  "These requests were made directly to the staff at Arlene's (sic) and to her RCEB caseworker and are documented in her records."  (*Id.* ¶ 28.)

2

On April 18, 2018, plaintiff, her counsel, her RCEB caseworker and Arleen's staff "unanimous[ly]" decided that she needed a person present in the group home who could communicate in Tactile ASL. (*Id.* ¶ 55.) Her IPP was "updated" to reflect this "agreement." (*Id.*) In a May 2018 follow-up letter, plaintiff's RCEB caseworker acknowledged that it was "imperative" to "help foster communication in American Sign Language (ASL) . . . so that Selena can communicate with the staff and individuals with whom she resides. Currently the staff at Arleen's Residential Care Home do not use ASL so we agreed to find a vendor to provide needed communication support in Selena's home." (*Id.* ¶ 56.)

On June 12, 2018, Disability Rights California ("DRC"), then representing plaintiff and other deaf and deaf-blind regional center consumers, sent a letter to the directors of RCEB and DDS about "the widespread problem with regional centers failing to accommodate deaf consumers." (*Id.* ¶ 67; *see also id.* ¶¶ 68–69.) The letter also addressed plaintiff's circumstances, describing that RCEB approved her accommodations for a signing staff member in her home and updated her IPP to reflect that agreement but had done nothing further. (*Id.* ¶ 70.) The letter closed by requesting that "RCEB honor the decision of the IPP team . . . without further delay." (*Id.* ¶ 71.) On July 13, 2018, attorneys for DRC and the director of RCEB as well as its Director of Consumer Services met to discuss plaintiff's IPP and "RCEB's refusal to comply with its terms." (*Id.* ¶ 72.) According to plaintiff, there was "no clear resolution as to when [she] would be provided the effective communication RCEB had agreed to." (*Id.*)

From September to December 2018, plaintiff was provided with an ASL-fluent aide for the afternoons and evenings. (*Id.* ¶ 47.) Prior to this time, plaintiff was "assigned a one-to-one aide who spends significant time with her to reduce the self-harm. However, that aide [was] never able to communicate in ASL." (*Id.*) Arleen's ultimately terminated the ASL-fluent aide for failure to complete mandatory staff training after it refused the aide's request for his own interpreter for the training. (*Id.* ¶ 49.) Other than this brief assignment, RCEB and Arleen's have not hired a staff member or behavioral consultant who could communicate in ASL. (*Id.* ¶¶ 32, 37.) "Despite the clear language of Ms. Melton's IPP requiring RCEB and Arleen's to provide effective communication in her home by hiring a person who can communicate in Tactile ASL, they still

1   have not done so."  (*Id.* ¶ 57.)

2         The FAC further alleges that despite its responsibility for overseeing the conduct of

3   regional centers and ensuring that they operate in compliance with federal and state law, DDS has

4   been aware of systemic inaccessibility for years but has taken no action.  (*Id.* ¶¶ 13, 59–63, 67–

5   75.)  For example, on November 6, 2017, DDS hosted a public meeting in Oakland, California, on

6   disparities in services for non-primary English speakers at RCEB and other regional centers in

7   California.  (*Id.* ¶ 59.)  During this meeting, individuals and advocates spoke about the disparities

8   in services for people who are deaf as compared to those provided to hearing consumers.  (*Id.*)

9         Then, as discussed above, on June 12, 2018, Disability Rights California sent DDS and

10  RCEB the letter raising the same issue.  (*Id.* ¶¶ 67–71.)  This letter was followed by a meeting on

11  July 24, 2018, between attorneys from DRC and three high level administrators at DDS, including

12  John Doyle and Brian Winfield, both Chief Deputy Directors and Hiren Paten, Chief Counsel.  (*Id.*

13  ¶ 73.)  On September 4, 2018, DRC sent a letter memorializing its understanding of the July 24th

14  meeting with DDS.  The letter stated, "You agreed to release a program advisory about the

15  affirmative obligations of regional centers to meet the communication needs of Deaf consumers in

16  their living situations, day programs, and work programs."  (*Id.* ¶ 74.)  However, as of the date of

17  the FAC, DDS has not done so.  "Nor has it taken action to intervene with RCEB on behalf of Ms.

18  Melton to ensure she has effective communication in her DDS-funded regional center services."

19  (*Id.* ¶ 75.)[1]

20        On November 29, 2018, DDS held a focus group for "Regional Center consumers who are

21  Deaf or Hard of Hearing, their families, and the community" to "receive your feedback on [ ]

22  barriers and challenges to accessing services."  (*Id.* ¶ 61.)  "A number of deaf support agencies

23  and vendors who serve deaf consumers attended the focus group to testify about the pervasive

---

25        [1] The Legislature intended that DDS "ensure that the regional centers operate in
26  compliance with federal and state law and regulation" and empowered it to "take all necessary
    actions to support regional centers to successful achieve compliance with this section . . . ."
27  W.I.C. § 4434(a), (b).  For example, "DDS may be required to provide services or supports
    directly where there are identified gaps in the system of services or where there are identified
28  consumers for whom no provider is available to provide the necessary services."  (FAC ¶ 14
    (citing W.I.C. § 4648(g)).)

4

issue of deaf consumers not receiving adequate access to services from regional centers throughout the State."  (*Id.* ¶ 62.)  Plaintiff "testified during this meeting about her experience living a home with no access to effective communication.  She testified that she feels very lonely and that no one in her home understands her needs."  (*Id.* ¶ 63.)

After the Court dismissed the original complaint upon defendants' motions to dismiss (Dkt. No. 47), plaintiff filed the FAC (Dkt. No. 48), seeking injunctive relief and damages pursuant to the following causes of action, namely violation of (1) Title II of the American Disabilities Act ("ADA") against DDS; (2) Title III of the ADA against RCEB and Arleen's; (3) Section 504 of the Rehabilitation Act against DDS and RCEB; (4) the Fair Housing Act against Arleen's; (5) California Government Code Section 11135 against RCEB; (6) the Unruh Civil Rights Act against RCEB and Arleen's; (7) the California Disabled Persons Act ("CDPA") against RCEB and Arleen's; and (8) the Elder Abuse and Dependent Adult Civil Protection Act against Arleen's; and additionally, (9) negligence against RCEB and Arleen's.  The FAC alleges that plaintiff substantially complied with the Lanterman Act's complaint process, outlined below, by writing to and meeting with RCEB and DDS about her unfulfilled IPP as well as system-wide inaccessibility, and therefore exhausted her applicable administrative remedies prior to seeking judicial relief.  (*Id.* ¶¶ 64–76.)

## II. LEGAL FRAMEWORK

### A. FEDERAL RULE OF CIVIL PROCEDURE 12(B)(1)

"Federal courts are courts of limited jurisdiction . . . [and] it is to be presumed that a cause lies outside this limited jurisdiction."  *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).  Under Federal Rule of Civil Procedure 12(b)(1), a defendant may challenge the plaintiff's jurisdictional allegations in one of two ways.  A "facial" attack accepts the truth of the plaintiff's allegations but asserts that they "are insufficient on their face to invoke federal jurisdiction."  *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004).  The district court resolves a facial attack as it would a motion to dismiss under Rule 12(b)(6), namely by determining whether the allegations are sufficient to invoke the court's jurisdiction while accepting the plaintiff's allegations as true and drawing all reasonable inferences in the plaintiff's

United States District Court
Northern District of California

United States District Court
Northern District of California

1   favor.  *Pride v. Correa*, 719 F.3d 1130, 1133 (9th Cir. 2013).

2          A "factual" attack, by contrast, contests the truth of the plaintiff's factual allegations,

3   usually by introducing evidence outside the pleadings.  *Safe Air for Everyone*, 373 F.3d at 1039.

4   "When the defendant raises a factual attack, the plaintiff must support her jurisdictional allegations

5   with 'competent proof' . . . under the same evidentiary standard that governs in the summary

6   judgment context."  *Leite v. Crane Co.*, 749 F.3d 1117, 1122 (9th Cir. 2014) (citations omitted).

7   "The plaintiff bears the burden of proving by a preponderance of the evidence that each of the

8   requirements for subject-matter jurisdiction has been met."  *Id.* (citation omitted).  "[I]f the

9   existence of jurisdiction turns on disputed factual issues, the district court may resolve those

10  factual disputes itself."  *Id.* (citations omitted).

11         **B.  FEDERAL RULE OF CIVIL PROCEDURE 12(B)(6)**

12         Under Federal Rule of Civil Procedure 12(b)(6), an action may be dismissed for "failure to

13  state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  Dismissal is appropriate

14  where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable

15  legal theory.  *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990).  The

16  complaint must allege "more than labels and conclusions, and a formulaic recitation of the

17  elements of a cause of action will not do."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

18  When considering a motion to dismiss, a court must accept all material allegations in the

19  complaint as true and construe them in the light most favorable to plaintiff.  *NL Indus., Inc. v.*

20  *Kaplan*, 792 F.2d 896, 898 (9th Cir. 1986).

21         **C.  ADMINISTRATIVE REMEDIES UNDER THE LANTERMAN ACT**

22         Chapter 7 of the Lanterman Act, titled "Appeal Procedure," provides that "all issues

23  concerning the rights of persons with developmental disabilities to receive services under this

24  division, shall be decided under this chapter[.]"  W.I.C. § 4706(a).  As a general matter, "[e]very

25  service agency shall, as a condition of continued receipt of state funds, have an agency fair hearing

26  procedure for resolving conflicts between the service agency and recipients of, or applicants for,

27  service."  *Id.* § 4705(a).  "Services" is defined as "the type and amount of services and service

28  components set forth in the recipient's individual program plan pursuant to Section 4646."  *Id.* §

1    4703.7.

2           Article 3 of this chapter describes the fair hearing procedure.  In particular, "[a]ny

3    applicant for or recipient of services, or authorized representative of the applicant or recipient

4    dissatisfied with any decision or action of the service agency which he or she believes to be illegal,

5    discriminatory, or not in the recipient's or applicant's best interests, shall, upon filing a request

6    within 30 days after notification of the decision or action complained of, be afforded an

7    opportunity for a fair hearing."  *Id.* § 4710.5(a).  Section 4712.5 provides that each party remains

8    bound by the final administrative decision and either party may appeal the decision "to a court of

9    competent jurisdiction."  *Id.* § 4712.5.

10          The Lanterman Act's "fair hearing procedures are a claimant's exclusive remedy for issues

11   relating to the provision of services, which must first be exhausted before seeking judicial relief in

12   the superior court."  *Harbor Reg'l Ctr. v. Office of Admin. Hearings*, 210 Cal. App. 4th 293, 312

13   (2012) (internal citations and quotations omitted).  "The administrative fair hearing procedures

14   should be used to resolve any challenge [the plaintiff or their representative] has to the facility the

15   regional center ultimately may select for [the plaintiff] and the services to be provided at that

16   facility.  The trial court should not resolve any such challenges in the first instance[.]"  *Michelle K.*

17   *v. Superior Court*, 221 Cal. App. 4th 409, 444 (2013).  "It is well settled that if an administrative

18   remedy is provided by statute, relief must be sought from the administrative body and such

19   remedy must be exhausted before judicial review of the administrative action is available. . . .

20   Accordingly, the exhaustion of an administrative remedy has been held jurisdictional in

21   California."  *Conservatorship of Whitley*, 155 Cal. App. 4th 1447, 1463–64 (2007); *Sierra Club v.*

22   *San Joaquin Local Agency Formation Com.*, 21 Cal. 4th 489, 510 (1999) ("The general exhaustion

23   rule remains valid: Administrative agencies must be given the opportunity to reach a reasoned and

24   final conclusion on each and every issue upon which they have jurisdiction to act before those

25   issues are raised in a judicial forum.").

26          In contrast to Article 3's fair hearing procedure, Article 5 provides for a different dispute

27   resolution process, namely, by complaint.  "Each consumer or any representative acting on behalf

28   of any consumer or consumers, who believes that any rights to which a consumer is entitled has

United States District Court
Northern District of California

7

1    been abused, punitively withheld, or improperly or unreasonably denied by a regional center,

2    developmental center, or service provider, may pursue a complaint as provided in this action."

3    W.I.C. § 4731(a).  However, the complaint process "shall not be used to resolve disputes

4    concerning the nature, scope, or amount of services and supports that should be included in an

5    individual program plan, for which there is an appeal procedure established in this division . . . ."

6    *Id.* § 4731(e).

7    **III.  ANALYSIS**

8           In renewing their motions to dismiss, defendants submit that dismissal is warranted on

9    three grounds: (A) plaintiff failed to exhaust her administrative remedies; (B) the claims are time-

10   barred; and (C) the FAC fails to state a claim for relief.  To navigate the parties' arguments, the

11   Court construes the FAC as primarily pursuing two distinct theories: (1) a failure by RCEB and

12   Arleen's to provide a particular requested accommodation; and (2) a failure by DDS and RCEB to

13   implement policies ensuring equal access to programs and services.  *Compare.* FAC §§ 26–57

14   (alleging that Arleen's and RCEB refuse to accommodate her deaf-blind disability), *with id.* § 58

15   (alleging that DDS and RCEB lacks policies reflecting their obligations to provide effective

16   communication).  The former focuses on plaintiff's individualized request for a staff member at

17   Arleen's who can communicate in Tactile ASL, while the latter focuses on the organizations'

18   policies or practices to improve systemic accessibility.  With this distinction in mind, the Court

19   turns to each asserted ground for dismissal.

20          **A.  12(B)(1) CHALLENGE BASED ON NON-EXHAUSTION**

21          All defendants move to dismiss this action for lack of subject matter jurisdiction, arguing

22   that plaintiff failed to properly exhaust her administrative remedies under the Lanterman Act.

23   Specifically, defendants submit that plaintiff is required to utilize the fair hearing procedure before

24   filing the instant action.  The Court agrees in part.

25          The Lanterman Act explicitly states that "there is an appeal procedure established" "to

26   resolve disputes concerning the nature, scope, or amount of services and supports that should be

27   included in an individual program plan."  W.I.C. § 4731(e).  The FAC alleges that defendants

28   failed to procure the Tactile ASL interpreter as set forth in her IPP.  (FAC ¶ 57 ("Despite the clear

United States District Court
Northern District of California

8

1  language of Ms. Melton's IPP requiring RCEB and Arleen's to provide effective communication

2  in her home by hiring a person who can communicate in Tactile ASL, they still have not done

3  it.").)  The failure to initiate a service included in plaintiff's IPP falls squarely within the purview

4  of the fair hearing procedure.[2]  Therefore, the fair hearing procedure applies to plaintiff's claims to

5

6        [2] Plaintiff's arguments to the contrary do not persuade.  First, plaintiff argues that the fair
hearing procedure governs disputes about "services and supports that should be included in an

7  individual program plan," whereas the complaint process governs disputes about services already
included in an IPP.  (Opp. to RCEB Mtn. at 8.)  However, plaintiff's citation to Section 4731

8  offers no support for the distinction that she draws.  Indeed, Section 4703.7 specifically defines
services for purposes of the appeal procedure chapter as "the type and amount of services and

9  service components *set forth in the recipient's individual program plan* pursuant to Section 4646."
W.I.C. § 4703.7 (emphasis supplied).  Because the statute's fair hearing provisions do not

10  distinguish between services included in an IPP and services requested for inclusion, this
argument fails.

11

12        Second, plaintiff relies on information posted on DDS's website explaining the difference

13  between the two procedures.  A webpage titled "Consumer Rights, Appeals & Complaints" lists
frequently answer questions, including:

14

15      HOW IS [THE CONSUMER COMPLAINT PROCESS] DIFFERENT FROM
    FAIR HEARING?

16      The Fair Hearing Process is the procedure to use if you disagree with the nature,

17      scope, or amount of services you receive, or are requesting the regional center to
    provide. This includes whether you are eligible for regional center services. Under

18      this process, you are appealing a decision of the regional center about the services
    you are requesting or receiving.

19

20      The Consumer Complaint Process is the procedure to use if you believe that the
    regional center, developmental center, or a provider, has violated or improperly

21      withheld a right to which you are entitled under the law. Under this process, you
    are asking that the regional center, developmental center, or provider, change its

22      procedures for dealing with you and others in the future.

23  (Plaintiff's Request for Judicial Notice, Dkt. No. 56, Ex. A.)  Although defendants do not dispute
the accuracy of this information, the Court reached its decision without need to resort to the DDS

24  webpage and therefore declines to grant the request for judicial notice.  In any event, plaintiff
argues that defendants' failure to provide her with the agreed-upon Tactile ASL interpreter

25  constitutes a deprivation of her civil rights, *i.e.*, "right[s] to which [she is] entitled under the law,"
and therefore claims arising therefrom are to be pursued under the complaint process, not the fair

26  hearing process.  However, plaintiff's specific entitlement to a Tactile ASL interpreter springs

27  from her right to receive services under the Lanterman Act, not from any civil rights statutes.
Therefore, this argument also fails.

28

United States District Court
Northern District of California

9

the extent that they are based on the failure to deliver services pursuant to her IPP (theory one).

The same cannot be said about the claims predicated on the failure to enact antidiscrimination policies (theory two). These claims implicate decisions impacting all Lanterman Act consumers with hearing impairments, not just plaintiff, and therefore do not qualify as a conflict between the service agency and the service recipient **about an agency action specific to her**. *See* W.I.C. § 4705(a). ("Every service agency shall . . . have an agency fair hearing procedure for resolving conflicts between the service agency and recipients of, or applicants for, service."); *see also Michelle K.*, 221 Cal. App. 4th at 442 (2013) ("The Lanterman Act's administrative fair hearing procedures allow a developmentally disabled person to challenge any *specific decision* a regional center or developmental center makes to reduce, terminate, change, or deny *that person services*.") (emphasis supplied). The fair hearing procedure is not equipped to adjudicate system-wide claims. *See* W.I.C. §§ 4710–4713 (describing extensive rules for appealing discrete agency actions denying, reducing, terminating, or changing services).

Nor does the broader aspect of her claims strictly involve "the rights of persons with developmental disabilities to receive services" but rather the right of equal access to such services. *See id.* § 4502(a) ("Persons with developmental disabilities have the same legal rights and responsibilities guaranteed all other individuals by the United States Constitution and laws and the Constitution and laws of the State of California. An otherwise qualified person by reason of having a developmental disability shall not be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity that receives public funds."). As such, the statute's complaint process applies to her claims of systemic inaccessibility. *See id.* § 4731(a) ("Each consumer or any representative acting on behalf of any consumer or consumers, who believes that any rights to which a consumer is entitled has been abused,

---

Third, plaintiff contends that applying state administrative exhaustion requirements to her federal civil rights claims violates the Supremacy Clause. However, regardless of the label used in the FAC, and as stated in the foregoing paragraph, those claims alleging a failure to provide services pursuant to the IPP implicate her right to services under the Lanterman Act, not her federal civil rights, and therefore are not properly characterized as federal civil rights claims. Accordingly, this argument lacks merit.

10

1  punitively withheld, or improperly or unreasonably denied by a regional center, developmental

2  center, or service provider, may pursue a complaint as provided in this section.").[3]

3        The question then is whether plaintiff properly exhausted this administrative remedy.  The

4  Court finds that, under the substantial compliance doctrine, she has.  "Substantial compliance with

5  a statute 'will suffice if the purpose of the statute is satisfied but substantial compliance means

6  *actual* compliance in respect to statutory purpose.  The doctrine of substantial compliance excuses

7  technical imperfections *only after the statutory objective has been achieved*.'"  *Goehring v.*

8  *Chapman University*, 121 Cal. App. 4th 353, 384 (2004) (quoting *Smith v. Board of Supervisors*,

9  216 Cal. App. 3d 862, 874–75 (1989)) (emphasis in original).

10       The Lanterman Act provides that "[i]nitial referral of any complaint taken pursuant to this

11 section shall be to the director of the regional center from which the consumer receives case

12 management services."  *Id.* § 4731(b).  The director of the regional center then investigates the

13 complaint and responds with a written proposed resolution.  *Id.*  If the consumer is not satisfied

14 with the proposed resolution, the complaint must then be referred to the director of the department,

15 who then issues a written administrative decision.  *Id.* § 4731(c).

16       Here, the FAC alleges that on June 12, 2018, Disability Rights California, plaintiff's

17 representative at the time, sent a letter to both the directors of RCEB and DDS about "the

18 widespread problem with regional centers failing to accommodate deaf consumers":

19       68. The letter stated, "Our [deaf] clients are excluded from participation in day-to-
20       day activities available to other consumers in residential programs funded by
         regional centers.  As compared to other hearing residents, these consumers are
21       denied the benefit of the social, emotional, and habilitative services offered in
         these residential settings.  Because these Deaf consumers cannot express their
22       most basic physical needs, they are denied access to services and supports of their
         choice, which are available to hearing residents.  This amounts to discrimination
23       in the administration of regional center-funded services, in violation of the ADA,

24 _____

25       [3] Although the fair hearing provisions refer to a consumer's "dissatisf[action] with any
   decision or action of the service agency which he or she believes to be . . . discriminatory," W.I.C.
26 § 4710.5(a), the individualized grievances asserted here are fundamentally concerned with the
   services selected for plaintiff.  Conversely, the allegations of discrimination are asserted on a
27 system-wide basis and therefore are not subject to the fair hearing process.  Accordingly, the Court
   need not decide whether Section 4710.5(a) violates the Supremacy Clause as suggested by
28 plaintiff in her briefing.

United States District Court
Northern District of California

United States District Court
Northern District of California

Section 504 and California law."

69. The letter stated further, "[N]either DDS nor RCEB have written policies to address the need for accommodations for Deaf consumers who use ASL and ensure that they have access to effective communication across all life domains. Such policies should address, for example, the procedures to obtain funding for accommodations, such as signing staff during evenings and weekends at facilities that do not have signing staff otherwise available."

FAC ¶¶ 67–69.

The FAC also alleges that neither the meeting on July 13, 2018 with RCEB's directors nor the meeting on July 24, 2018 with DDS's administrators and chief counsel resolved the grievances set out in plaintiff's letter. *Id.* ¶¶ 72–76. In particular, DRC memorialized its understanding of the July 24 meeting with DDS with a follow-up letter stating: "You agreed to release a program advisory about the affirmative obligations of regional centers to meet the communication needs of Deaf consumers in their living situations, day programs, and work programs." *Id.* ¶ 74. However, no such advisory has been released to date. *Id.* ¶ 75.

Defendants are correct that because plaintiff did not identify a proposed resolution by RCEB and/or an administrative decision by DDS, plaintiff did not strictly comply with the Section 4731 complaint process. *See* W.I.C. § 4731(b)–(c).[4] However, nothing in the record suggests the Legislature intended strict compliance with a process designed for a consumer who believes her rights are being "abused, punitively withheld, or improperly or unreasonably denied." *See* W.I.C. § 4731(a). Indeed, based on the provision's use of permissive language the Court finds that the purpose of the complaint process is to allow the responsible entity an opportunity to redress the alleged rights violation by giving notice thereof. *See id.* (consumer alleging rights violation "*may*

---

[4] Defendants also fault plaintiff for failing to comply with 17 C.C.R. Section 50540, which requires complaints to be initially referred "to the clients' rights advocate responsible for the facility in which such person is a resident or of which such person is a client." 17 C.C.R. § 50540(b). Plaintiff argues that this regulation, which is titled "Complaint Procedure," describes "a completely separate [complaint] process." (Opp. to Arleen's Mtn. at 8.) Although the Court notes that the regulation slightly varies from Section 4731 in terms of the complaint procedure, the Court assumes without deciding that the regulation applies. Even so, for the reasons that follow, the Court finds that only substantial compliance with the complaint process is required and therefore the failure to submit a complaint to the clients' rights advocate is not fatal to plaintiff's systemic inaccessibility claims.

12

1    pursue a complaint as provided in this section"); *cf. id.* § 4706(a) (service-related disputes "*shall*

2    be decided*" under fair hearing procedure).  *See, e.g., J.H. McKnight Ranch, Inc. v. Franchise Tax*

3    *Bd.*, 110 Cal. App. 4th 978, 986 (2003) ("'The purposes of these statutory [exhaustion]

4    requirements is to ensure that the Board receives sufficient notice of the claim and its basis.  The

5    Board then has an opportunity to correct any mistakes, thereby conserving judicial resources.' . . .

6    We see no basis for construing the statutes setting out the administrative exhaustion requirement

7    so as to ignore actual notice the Board may have had from sources other than the four corners of

8    the initial claim.") (quoting *Preston v. State Bd. of Equalization*, 25 Cal.4th 197, 205–06 (2001)).[5]

9         Also unlike the fair hearing procedure, Section 4731 is silent as to both the binding effect

10   of the outcome of the complaint process as well as the right to appeal the outcome to a court.

11   *Compare id.* § 4731 *with id.* § 4712.5(b) ("[E]ach party shall be bound [by the final administrative

12   decision following the fair hearing], and [] either party may appeal the decision to a court of

13   competent jurisdiction within 90 days of the receiving notice of the final decision.").  This

14   comparative silence supports the alternative conclusion that only substantial compliance with the

15   complaint process is required for exhaustion purposes.  *See Brown v. Kelly Broadcasting Co.*, 48

16   Cal.3d 711, 725 (1989) ("It is a well recognized principle of statutory construction that when the

17   Legislature has carefully employed a term in one place and has excluded it in another, it should

18   not be implied where excluded.").

19        Here, the FAC alleges that plaintiff's representative met with both RCEB and DDS

20   following the letter addressing systemic inaccessibility and that DDS agreed to a potential solution

21   of the issue.  These allegations demonstrate that defendants were not only aware of the complaint

22   but presumably investigated its merits, thereby fulfilling the objective of the statute's complaint

23   mechanism, namely, to permit an opportunity to cease unlawful activity.  Under such

24   circumstances and unlike the fair hearing procedure, no purpose would be served by requiring

25   plaintiff to strictly comply with Section 4731 based on the formalistic ground that no written

26

27        [5] The Court has found no case addressing the Lanterman Act's complaint process, much
     less one addressing compliance required therewith.

28

United States District Court
Northern District of California

United States District Court
Northern District of California

1  proposed resolution by RCEB or written administrative decision by DDS was obtained.

2  Accordingly, the Court concludes that the letter of plaintiff's representative substantially complies

3  with the Lanterman Act's complaint process.[6]

4  　　　In sum, plaintiff's claims of systemic inaccessibility are not subject to the mandatory

5  fearing hearing process.  Such claims are encompassed by the first cause of action for a violation

6  of Title II of ADA against DDS; the second cause of action for violation of Title III of the ADA

7  against RCEB and Arleen's; the third cause of action for violation of Section 504 of the

8  Rehabilitation Act against DDS and RCEB; the fifth cause of action for violation of California

9  Government Code Section 11135 against RCEB; the sixth cause of action for violation of the

10  Unruh Civil Rights Act against RCEB and Arleen's; and the seventh cause of action for violation

11  of the CDPA against RCEB and Arleen's.  These claims are, however, subject to the complaint

12  process in order to give defendants an opportunity to correct their alleged policymaking failures.

13  Because the Court finds that plaintiff substantially complied the complaint process, the remedy

14  has been exhausted and therefore jurisdiction over these claims is proper.[7]

15  　　　The remaining causes of action, namely, the fourth cause of action for violation of the Fair

16  Housing Act against Arleen's, the eighth cause of action for violation of the Elder Abuse and

17  Dependent Adult Civil Protection Act against Arleen's, and the ninth cause of action for

18  negligence against RCEB and Arleen's, do not allege system-wide discrimination.  Instead, these

19  causes of action raise discrete unlawful acts.  To the extent that these (or any other) causes of

20  action are based on services requested or included in plaintiff's IPP, they are subject to the

21  mandatory fair hearing process.  Because plaintiff did not exhaust this administrative remedy, the

22  

23  　　　[6] To the extent defendants fault plaintiff for not attaching the written complaint to the FAC
despite alleging the contents of the letter addressing the alleged rights violations, such an
24  argument is not well taken.  Indeed, the statute does not state what form such a complaint must
take or what information must be included in such a complaint.  Therefore, the alleged letter itself
25  does not violate any statutory requirement as to the form of a Section 4731 complaint.

26  

27  　　　[7] Accordingly, RCEB's motion to sanction plaintiff's counsel for pressing arguments
about exhaustion under Section 4731's complaint process, which the Court accepted in part, is
28  hereby **DENIED**.

1   Court lacks jurisdiction over these IPP-based claims.  To the extent that these causes of action are

2   not based on IPP-related services, the FAC fails to allege that these issues were raised in the

3   DRC's complaint letter.  Either way, the fourth, eighth, and ninth cause of action are **DISMISSED**

4   **WITH PREJUDICE**.

5       Accordingly, the motions to dismiss for lack of subject matter jurisdiction is **GRANTED IN**

6   **PART AND DENIED IN PART**. The Court now considers the 12(b)(6) challenges in connection with

7   the first, second, third, fifth, sixth, and seventh causes of action insofar as they asserted against

8   DDS and RCEB.  Because Arleen's only challenged the FAC on the ground that plaintiff failed to

9   exhaust the fair hearing procedure, the second, sixth, and seventh causes of action survive as to it.

10      **B.   12(B)(6) CHALLENGE BASED ON UNTIMELINESS**

11      Defendants DDS and RCEB move to dismiss this action for failure to bring timely claims,

12  arguing that plaintiff's claims are based on incidents that accrued between six and twenty-six years

13  before this lawsuit was filed.  "[The continuing violations doctrine extends the accrual of a claim

14  if a continuing system of discrimination violates an individual's rights up to a point in time that

15  falls within the applicable limitations period."  *Douglas v. Cal. Dep't of Youth Auth.*, 271 F.3d

16  812, 822 (9th Cir. 2001) (citation omitted).  The continuing violations doctrine applies if the

17  plaintiff alleges "a systematic policy or practice of discrimination that operated, in part, within the

18  limitations period-a systemic violation."  *Id.* (citation omitted).  "A systemic violation claim

19  requires no identifiable act of discrimination in the limitations period, and refers to general

20  practices or policies[.]"  *Id.* (citation omitted); *see also Flowers v. Carville*, 310 F.3d 1118, 1126

21  (9th Cir. 2002) ("The doctrine applies where there is no single incident that can fairly or

22  realistically be identified as the cause of significant harm.").

23      DDS acknowledges that the continuing violation doctrine allows claims which are

24  otherwise barred by the applicable statute of limitations to proceed where general practices or

25  policies are the reason a plaintiff has suffered discrimination, but submits that plaintiff fails to

26  plead facts demonstrating that DDS had a general discriminatory policy or practice against

27  individuals with sight or hearing impairments.  However, the FAC alleges that DDS administers

28  services pursuant to the Lanterman Act without ensuring effective communication for hearing-

United States District Court
Northern District of California

impaired consumers like plaintiff and continues to do so.  FAC ¶¶ 94–99, 124–127.  Therefore, so

long as plaintiff is denied meaningful access to services provided pursuant to the Lanterman Act,

the violation of disability discrimination laws continue.  *See Pickern v. Holiday Quality Foods*

*Inc.,* 293 F.3d 1133, 1136–37 (9th Cir. 2002) ("So long as the discriminatory conditions continue,

and so long as a plaintiff is aware of them and remains deterred, the injury of the ADA

continues."); *see, e.g.*, *Mosier v. Kentucky*, 675 F. Supp. 2d 693, 698 (E.D. Ky. 2009)

("Governments continue to discriminate against persons with disabilities by providing court

proceedings without interpreters or auxiliary aids.  Therefore, so long as Plaintiff is denied

meaningful access to Defendants' programs, the violation of the ADA continues.  Plaintiff asserts

that barriers still exist; thus, Plaintiff asserts a claim that falls within the statute of limitations.").

To find otherwise would destroy the requirement that governments provide persons with

disabilities "meaningful access" to programs.  *See Alexander v. Choate,* 469 U.S. 287, 301 (1985).

Accordingly, the remaining claims, as they are based on systemic failures to remedy accessibility

barriers that still exist, are not time-barred.  The motion to dismiss the FAC on the basis of

untimeliness is therefore **DENIED**.

### C.  12(B)(6) CHALLENGE BASED ON INSUFFICIENCY OF PLEADINGS

#### 1.  VIOLATION OF TITLE II OF ADA AGAINST DDS

DDS moves to dismiss the first cause of action on two grounds: (1) failure to allege

sufficient facts demonstrating that plaintiff was denied services by reason of her disability; and (2)

failure to allege sufficient facts demonstrating intentional discrimination for purposes of monetary

relief.  The Court finds that neither argument has merit.

Title II of the ADA "forbids any 'public entity' from discriminating based on disability."

*Fry v. Napoleon Cmty. Sch.*, 137 S. Ct. 743, 749 (2017).  Title II provides: "[N]o qualified

individual with a disability shall, by reason of such disability, be excluded from participation in or

be denied the benefits of the services, programs, or activities of a public entity, or be subjected to

discrimination by any such entity."  42 U.S.C. § 12132.  To prove that a public program or service

violated Title II of the ADA, a plaintiff must show that plaintiff  is (1) "a 'qualified individual

with a disability';" who (2) "was either excluded from participation in or denied the benefits of a

public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (3) such exclusion, denial of benefits, or discrimination was by reason of [the] disability." *Updike v. Multnomah Cty.*, 870 F.3d 939, 949 (9th Cir. 2017) (quoting *Duvall v. City of Kitsap*, 260 F.3d 1124, 1135 (9th Cir. 2001), *as amended on denial of reh'g en banc* (Oct. 11, 2001)). Where, as here, a disability action seeks monetary relief, a plaintiff must also prove a fourth element, intentional discrimination, met by allegations that satisfy the "deliberate indifference" standard. *See Duvall*, 260 F.3d at 1138–39.

First, like the original complaint, the FAC adequately alleges that plaintiff was denied equal access to DDS's services by reason of her disability. In *Lee v. City of Los Angeles*, 250 F.3d 668 (9th Cir. 2001), the Ninth Circuit explained that the ADA "not only prohibits public entities from discriminating against the disabled, but it also prohibits public entities from *excluding* the disabled from participating in *or* benefitting from a public program, activity or service 'solely by reason of disability.'" *Id.* at 691 (quoting *Weinreich v. Los Angeles County Metro. Transp. Auth.*, 114 F.3d 976, 978–79 (9th Cir. 1997)). The Ninth Circuit concluded that "[q]uite simply, the ADA's broad language brings within its scope anything a public entity does." *Id.* Here, the FAC alleges that "DDS's lack of any policies, procedures, or practices regarding accessibility for deaf consumers results in the widespread denial of effective communication. It also denies deaf consumers the opportunity to benefit from DDS's I/DD services and programs that is afforded to hearing consumers." (FAC ¶ 95.) These allegations adequately plead that plaintiff is "denied 'meaningful access' to state-provided services" by reason of her disability. *See Crowder v. Kitagawa,* 81 F.3d 1480, 1484 (9th Cir. 1996). Accordingly, DDS's first argument fails.

Second, unlike the original complaint, the FAC now adequately alleges deliberate indifference for purposes of pleading intentional discrimination. A plaintiff sufficiently alleges deliberate indifference by pleading two elements: (i) notice of the need for accommodation, and (ii) a failure to act. *See Duvall*, 260 F.3d at 1139. A plaintiff can allege notice by pleading that: (a) the plaintiff "alerted the public entity to [the plaintiff's] need for accommodation," (b) "the need for accommodation [was] obvious," or (c) the need for accommodation was "required by statute or regulation." *Id.* at 1139. The failure to act, meanwhile, "must be a result of conduct that

United States District Court
Northern District of California

17

1    is more than negligent" and "involve[ ] an element of deliberateness."  *Id.*  Failure that is merely

2    "attributable to bureaucratic slippage" does not amount to deliberate indifference.  *Id.*

3         Previously, the Court found that plaintiff's "allegations with respect to both notice and

4    failure to act are lacking."  (Dkt. No. 47 at 13.)  However, the FAC cures these deficiencies with

5    the following allegations:

> 59.  On November 6, 2017, DDS hosted a public meeting in Oakland, California, on disparities in services for non-primary English speakers at RCEB and other regional centers in California.  During this meeting, individuals and advocates spoke about the disparities in services for people who are deaf and the failure of RCEB and other regional centers to accommodate their needs so that they received services equal to those provided to hearing consumers.

> 67.  On June 12, 2018, Disability Rights California, then representing Ms. Melton and other deaf and deaf-blind regional center consumers, sent a letter to the director of RCEB and the director DDS regarding the widespread problem with regional centers failing to accommodate deaf consumers.  The letter specifically addressed Ms. Melton's circumstances.

> 71.  The letter requested a meeting with DDS and RCEB to discuss specific steps they could take to resolve the individual issues of Ms. Melton and also the policy issues affecting deaf consumers served by regional centers throughout the state.

> 72.  On July 13, 2018, a meeting was held between attorneys for Disability Rights California and the director of RCEB as well as its Director of Consumer Services. Ms. Melton's IPP and RCEB's refusal to comply with its terms was discussed with no clear resolution as to when Ms. Melton would be provided the effective communication RCEB had agreed to.

> 73.  On July 24, 2018, a meeting was held between attorneys from Disability Rights California and three high level administrators at DDS, including John Doyle and Brian Winfield, both Chief Deputy Directors and Hiren Patel, Chief Counsel.

> 74.  On September 4, 2018, Disability Right California sent a letter memorializing its understanding of the July 24th meeting with DDS.  The letter stated, "You agreed to release a program advisory about the affirmative obligations of regional centers to meet the communication needs of Deaf consumers in their living situations, day programs, and work programs."

> 75.  As of the date of this Complaint, DDS has never released an advisory to the regional centers relating to their obligations around the needs of deaf consumers. Nor has it taken action to intervene with RCEB on behalf of Ms. Melton to ensure she has effective communication in her DDS-funde[d] regional center services.

United States District Court
Northern District of California

61.  On November 29, 2018, DDS held a focus group for "Regional Center consumers who are Deaf or Hard of Hearing, their families and the community" to "receive your feedback on [ ] barriers and challenges to accessing services."

62.  A number of deaf support agencies and vendors who serve deaf consumers attended the focus group to testify about the pervasive issue of deaf consumers not receiving adequate access to services from regional centers throughout the State.

63.  Ms. Melton testified during this meeting about her experiences living in a home with no access to effective communication.  She testified that she feels very lonely and that no one in her home understands her needs.

FAC ¶¶ 59, 61–63, 67, 71–72.

The foregoing allegations amply plead DDS's notice of the need for accommodation for deaf consumers and its failure to act thereon.  DDS's argument that plaintiff fails to adequately allege intentional discrimination does not persuade.  Accordingly, DDS's motion to dismiss the cause of action for violation of Title II of the ADA is **DENIED**.

### 2.  VIOLATION OF TITLE III OF ADA AGAINST RCEB

RCEB moves to dismiss the second cause of action on two grounds: (1) RCEB is not a "place of accommodation" under the ADA; and (2) failure to allege sufficient facts demonstrating that plaintiff was discriminated against because of her disability.  The Court finds that both arguments are unavailing.

Title III provides: "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a).  To prevail on a Title III discrimination claim, the plaintiff must show that the plaintiff  is (1) "disabled within the meaning of the ADA; (2) the defendant is a private entity that owns, leases, or operates a place of public accommodation; and (3) the plaintiff was denied public accommodations by the defendant because of [the] disability."  *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 730 (9th Cir. 2007) (citation omitted).

For reasons similar to those stated above as to DDS, the FAC sufficiently alleges that

19

United States District Court
Northern District of California

1   plaintiff was denied meaningful access to services secured by RCEB by reason of her disability

2   and therefore RCEB's second argument fails. *See* FAC ¶¶ 108 ("Because Ms. Melton is deaf-

3   blind, RCEB . . . [is] required and responsible to (sic) provide necessary accommodations in order

4   to provide her equal access to [its] programs, ensure effective communication and prevent

5   exclusion, segregation and the denial of services."), 109(a) (RCEB violates the ADA by "[f]ailing

6   to ensure that the I/DD service providers [it] hire[s] communicate effectively with Ms. Melton),

7   109(c) (RCEB further violates the ADA by "[a]ffording Ms. Melton an opportunity to participate

8   in or benefit from [RCEB's] programs, facilities, accommodations and activities that is not equal

9   to that afforded others").

10         With respect to RCEB's first argument that it does not qualify as a place of

11   accommodation, the Court rejects RCEB's attempt to escape its obligations under Title III.

12   Although RCEB is a private, nonprofit corporation, the FAC alleges that RCEB contracts with

13   DDS, a state agency, to coordinate the delivery of services, including adult residential facilities,

14   for developmentally disabled persons.  (FAC ¶¶ 11, 18, 25.)  The United States Department of

15   Justice published guidance addressing a virtually identical situation:

16  
17         A private, nonprofit corporation operates a number of group homes under contract
        with a State agency for the benefit of individuals with mental disabilities.  These
        particular homes provide a significant enough level of social services to be
18         considered places of public accommodation under title III.  The State agency must
        ensure that its contracts are carried out in accordance with title II, and *the private*
19         *entity must ensure that the homes comply with title III.*

20   U.S. Dep't of Justice, Title II Technical Assistance Manual: Covering State and Local

21   Government Programs and Services, The Americans with Disabilities Act,

22   https://www.ada.gov/taman2.html#II-1.1000 (last visited November 5, 2021) (emphasis

23   supplied).[8]  Based on the foregoing illustration, and the contractual relationship that allegedly

24  

25   _____

26         [8] DOJ regulations implementing Title III require that a public accommodation "furnish
        appropriate auxiliary aids and services where necessary to ensure *effective communication* with
        individuals with disabilities."  28 C.F.R. § 36.303(c)(1) (emphasis supplied).  The United States
27         Supreme Court has looked to DOJ's Manuals for guidance in the Title III context.  *See Bragdon v.*
        *Abbott*, 524 U.S. 624, 646 (1998) (holding that DOJ's administrative guidance on ADA
28         compliance is entitled to deference).

exists between RCEB and its group home vendors (FAC ¶ 25), the Court concludes that whether RCEB itself is a public accommodation is beside the point.  Because RCEB facilitates access to the services of its group home vendors, which presumably are public accommodations, RCEB must ensure their compliance with Title III.  Accordingly, Title III applies, and RCEB's motion to dismiss this cause of action is **DENIED**.

### 3. VIOLATION OF SECTION 504 OF THE REHABILITATION ACT AGAINST **DDS** AND **RCEB**

DDS moves to dismiss the third cause of action on the same grounds it moved to dismiss the Title II claim, namely, failure to allege causation and intentional discrimination.  RCEB moves to dismiss this cause of action also on two grounds, namely, failure to allege causation as well as RCEB's receipt of federal funding.  None of these arguments have merit.

Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance."  29 U.S.C. § 794(a).  To state a claim under Section 504, a plaintiff must allege that the plaintiff (1) is an individual with a disability and (2) is otherwise qualified to participate in a program or activity; (3) the program or activity receives federal financial assistance; and (4) the plaintiff suffered discrimination on the basis of the disability.  *See Bonner v. Lewis*, 857 F.2d 559, 562–63 (9th Cir. 1988).

For the reasons stated above as to the Title II claim, the FAC sufficiently alleges that plaintiff was denied meaningful access to DDS's services on the basis of her disability and that, for purposes of seeking monetary relief, DDS had notice of the need for accommodation but failed to take action.  Accordingly, DDS's motion to dismiss the Section 504 cause of action against it is **DENIED**.  *See Olmstead v. Zimring*, 527 U.S. 581, 589-90 (1999) (essentially same showing required to state a claim under Section 504 of Rehabilitation Act as to state a claim under Title II of ADA).  By the same logic, RCEB's argument regarding failure to allege causation also fails.

With respect to RCEB's argument that the FAC does not sufficiently allege its receipt of federal funding, the Court disagrees.  The FAC alleges:

116.  At all times relevant to the Complaint Defendant DDS is a recipient of federal financial assistance within the meaning of Section 504.  DDS's I/DD services program is a "program or activity receiving Federal financial assistance" because DDS receives federal funding directly and indirectly through federal medical and social services program to ensure the provision of I/DD services.

117.  At all times relevant to the Complaint Defendant RCEB has been a recipient of federal assistance within the meaning of Section 504.  RCEB is a "program or activity receiving Federal financial assistance" as referred to in 29 U.S.C. § 764(a), because it is an operation of DDS, which received Federal financial assistance for its services.  Nearly 100% of the federal funding DDS receives is funneled into the regional centers, including RCEB.  RCEB was created for the express purpose of receiving and distributing those funds.

FAC ¶¶ 116–17.

At this stage, the Court finds these allegations as to RCEB's receipt of federal financial assistance sufficient to withstand the motion to dismiss.  "[T]he vast majority of courts faced with the issue of whether an entity receives federal financial assistance within the meaning of the civil rights laws have concluded that the resolution of the issue requires inquiry into factual matters outside the complaint and, accordingly, is a matter better suited for resolution after both sides have conducted discovery on the issue."  *PAS Commc'ns, Inc. v. U.S. Sprint, Inc.*, 112 F. Supp. 2d 1106, 1111 (D. Kan. 2000) (collecting cases).  Thus, RCEB's argument that the FAC lacks "further explanation regarding those funds" is not well taken.  Accordingly, RCEB's motion to dismiss the Section 504 cause of action against it is also **DENIED**.  To the extent that these allegations are, in fact, not true, that would be the subject of summary judgment, not a motion to dismiss.

### 4.  VIOLATION OF CALIFORNIA GOVERNMENT CODE SECTION 11135 AGAINST RCEB

RCEB moves to dismiss the fifth cause of action for failure to allege sufficient facts demonstrating that plaintiff was discriminated against because of her disability.  California Government Code Section 11135 prohibits denying persons with a disability "full and equal access to the benefits of, or be unlawfully subjected to discrimination under, any program or activity that is conducted, operated, or administered by the state or by any state agency, is funded directly by the state, or receives any financial assistance from the state."  Cal. Gov. Code

§11135(a).  Section 11135 "is identical to the Rehabilitation Act except that the entity must receive State financial assistance rather than Federal financial assistance."  *Y.G. v. Riverside Unified Sch. Dist.,* 774 F. Supp. 2d 1055, 1065 (C.D. Cal. 2011); *D.K. ex rel. G.M. v. Solano County Office of Educ.,* 667 F. Supp. 2d 1184, 1191 (E.D. Cal. 2009).  Section 11135 is also coextensive with the ADA because it incorporates the protections and prohibitions of the ADA and its implementing regulations.  *See* Cal. Gov. Code § 11135(b) (so stating).  For the reasons stated above, the FAC sufficiently alleges that plaintiff was excluded from services coordinated by RCEB by reason of her disability.  The motion to dismiss the cause of action for violation of California Government Code Section 11135 is **DENIED.**

### 5.   VIOLATION OF THE UNRUH CIVIL RIGHTS ACT AGAINST RCEB

RCEB moves to dismiss the sixth cause of action on the ground that it is not a "business establishment," and thus, the Unruh Act does not apply to it.  The Unruh Act prohibits "all business establishments of every kind whatsoever" from discriminating on the basis of disability.  Cal. Civ. Code § 51(a).  The Unruh Act prohibits discrimination "by a 'business establishment' in the course of furnishing goods, services or facilities to its clients, patrons or customers."  *Alcorn v. Anbro Eng'g, Inc.,* 2 Cal.3d 493, 500 (1970).  The California Supreme Court held that the term "business establishments" in the Unruh Act "was used in the broadest sense reasonably possible."  *Burks v. Poppy Constr. Co.,* 57 Cal.2d 463, 468 (1962). The *O'Connor* court explained that there is "no reason to insist that profit-seeking be a sine qua non for coverage under the act.  Nothing in the language or history of its enactment calls for excluding an organization from its scope simply because it is nonprofit."  *Id.* at 430–31; *see also Doe v. California Lutheran High Sch. Ass'n,* 170 Cal. App. 4th 828, 836 (2009) ("An organization is not excluded from the scope [of the act] simply because it is a nonprofit."). Accordingly, any analysis must look beyond whether the corporation in question is for-profit or non-profit to whether the organization has a "businesslike purpose."  *O'Connor*, 662 P.2d at 431.

To determine whether or not an organization qualifies as a "business establishment" under the Unruh Act, courts consider the following nonexclusive factors:

1. what, if any, business benefits one may derive from membership; 2. the number

23

1

2

3

4

and nature of paid staff; 3. whether the organization has physical facilities, and if so, whether those facilities are incidental to the purposes and programs of the organization; 4. what are the purposes and activities of the organization; 5. the extent to which the organization is open to the public; 6. whether there are any fees or dues for participation or membership, and if so, what percentage of those involved in the organization pay them; and 7. the nature of the organization's structure.

5

*Harris v. Mothers Against Drunk Driving,* 40 Cal. App. 4th 16, 20 (1995).  RCEB contends that

6

the FAC lacks any indication that RCEB engaged in anything "synonymous with calling,

7

occupation or trade, engaged in for the purpose of making a livelihood or gain."  (RCEB Mtn. at

8

23 (quoting *Taorminia v. Cal. Dep't of Corrections*, 946 F. Supp. 829, 834 (S.D. Cal. 1996)).)

9

The thrust of this argument was accepted in *Roe v. California Dep't of Developmental*

10

*Servs.*, No.16-CV-3745 (WHO), 2017 WL 2311303 (N.D. Cal. May 26, 2017).  There, the court

11

concluded that the plaintiff did not plead sufficient facts to establish that RCEB, also a defendant

12

in that case, was a business establishment.  "She merely recites the elements of a claim under the

13

Unruh Act. . . .  On the current record, it is impossible to tell whether RCEB has any of the typical

14

features of a 'business establishment'—whether, for example, it has a board of directors, whether

15

it has a large number of employees, whether and whom it charges fees in exchange for services,

16

and other crucial facts are all omitted."  *Id.* at *16 (citations omitted).

17

The same is not true here, where the FAC alleges:

18

19

20

21

22

23

157.  Defendant RCEB is a non-profit business establishment, with business-like purposes.  RCEB is a service coordination center for people with developmental disabilities, governed by a board of directors.  RCEB employs approximately 450 people who work together to coordinate contracted services for members.  RCEB members are assisted with accessing a panoply of services, including out of home placement, in-home supports, testing, training and educational opportunities to equip members with the tools necessary to live their most productive and satisfactory lives despite their disabilities.  These services are provided by vendors under contract with RCEB.

24

25

26

158.  RCEB collects an annual family program fee for families with children under age 18 with adjusted gross incomes above a certain level.  RCEB also implements a Family Cost Participation Program with requires families with children under age 18 to pay a certain amount of the cost of programmatic services for their children.

27

28

159.  RCEB has physical offices at 500 Davis Street, San Leandro, California and 1320 Willow Pass Road in Concord, California.  Its caseworkers and managers

24

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

operate from those offices.  It sets its policies there.  It conducts meetings for, with, and regarding its clients, its vendors and DDS, its funder, at those offices. Meetings conducted there include meetings for individual clients, at which the level of services is set and reviewed.  In addition, RCEB holds support meetings and advisory meetings, vendor meetings and board meetings at its two locations, all of which are open indiscriminatory to other members of the general public.

FAC ¶¶ 157–59.

The Court finds these allegations as to RCEB's status as a busines establishment sufficient to withstand the motion to dismiss.  "In light of the multi-factored test under which courts determine if an entity qualifies as a business establishment and considering that courts have found that [non-profit corporations] qualify, whether [RCEB] qualifies depends on facts that are not fully developed and that are not yet before the Court."  *R.K., ex rel. T.K. v. Hayward Unified School Dist.*, No. 06-CV-7836 (JSW), 2007 WL 2778730, at *7 (N.D. Cal. Sept. 21, 2007) (declining to "dismiss the Unruh Act claim on this basis at this procedural stage").  Accordingly, the motion to dismiss the cause of action for violation of the Unruh Act is **DENIED**.

### 6.   VIOLATION OF THE CALIFORNIA DISABLED PERSONS ACT AGAINST RCEB

RCEB moves to dismiss the seventh cause of action on the ground that plaintiff cannot maintain a CDPA claim based on the denial of services.  The California Disabled Persons Act provides that individuals with disabilities "shall be entitled to full and equal access, as other members of the general public, to . . . places of public accommodation."  Cal. Civ. Code § 54.1(a)(1).  According to RCEB, "[t]he CDPA is concerned solely with *physical* access to public spaces."  (RCEB Mtn. at 25 (quoting *Gasca v. County of Monterey*, No. 16-CV-4221 (BLF), 2019 WL 1455329, at *2 (N.D. Cal. April 2, 2019)).)  However, the California Supreme Court has stated otherwise.  *See Jankey v. Lee*, 55 Cal.4th 1038, 1044–45 (2012) ("[The California Disabled Persons Act] generally guarantees people with disabilities equal rights of access 'to public places, buildings, facilities and *services*, as well as common carriers, housing and places of public accommodation.'") (quoting *Munson v. Del Taco, Inc.*, 46 Cal. 4th 661, 674 n.8 (2009)) (emphasis supplied).

More fundamentally, the CDPA provides that "[a] violation of the right of an individual under the Americans with Disabilities Act of 1990 also constitutes a violation of this section,

and this section does not limit the access of any person in violation of that act." Cal. Civ. Code § 54.1(d). Because plaintiff's ADA claims remain viable, so too does her CDPA claim. Accordingly, the motion to dismiss the cause of action for violation of the CDPA is **DENIED**.

## IV.   CONCLUSION

For the foregoing reasons, the motions to dismiss are **GRANTED IN PART AND DENIED IN PART**. The first, second, third, fifth, sixth, and seventh causes of action survive both the 12(b)(1) challenge, as they allege systemic discrimination addressed in the June 2018 DRC letter and therefore have been properly exhausted pursuant to Section 4731, as well as the 12(b)(6) challenges. Conversely, the fourth, eighth, and ninth causes of action are **DISMISSED WITH PREJUDICE** under Rule 12(b)(1). These causes of action are either based on specific IPP-service issues, in which case they have not been exhausted under the fair hearing procedure; or not IPP-related, but were not otherwise raised in the aforementioned letter and therefore have not been exhausted under the Section 4731 complaint process. The motion for sanctions is **DENIED** as plaintiff's arguments are not found to be frivolous.

Defendants shall respond to the remaining causes of action within **twenty (21) days** of filing. The Court hereby **SETS** an initial case management conference for **December 13, 2021**, at **9:00 a.m.** via Zoom.

The Order terminates Docket Numbers 52, 53, 54, and 64.

**IT IS SO ORDERED.**

Dated: November 5, 2021

_____
**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT COURT JUDGE**